UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
---------------------------------------------------------x
ANDERSON JOSEPH,

                Plaintiff,

        - against -

COUNTY OF NASSAU and NASSAU
HEALTH CARE CORPORATION,

                Defendants.
---------------------------------------------------------x

**MEMORANDUM & ORDER**
18-CV-2290 (PKC) (PK)

PAMELA K. CHEN, United States District Judge:

Plaintiff Anderson Joseph, proceeding *pro se*, brings this action against Defendants County of Nassau and Nassau Health Care Corporation ("NHCC"), alleging violations of 42 U.S.C. § 1983, in connection with his incarceration at the Nassau County Correctional Center ("NCCC"). Before the Court are Defendants' motions for summary judgment. For the reasons stated below, Defendants' motions are granted in full, and this case is dismissed.

## BACKGROUND

### I. Relevant Facts[1]

#### A. Plaintiff's Excessive Force Allegations

From January 23, 2018 to May 9, 2018, Plaintiff was incarcerated at the NCCC for violating his probation. (Deposition of Anderson Joseph ("Joseph Dep."), Dkt. 105-4, at 7:20–8:18.) During his incarceration, he was moved "back and forth" between two different housing

---

[1] Unless otherwise noted, a standalone citation to Defendants' 56.1 Statement or Plaintiffs' 56.1 Counterstatement, denotes that this Court has deemed the underlying factual allegation undisputed. Any citations to Defendants' 56.1 Statement or Plaintiffs' 56.1 Counterstatement incorporate by reference the documents cited therein. Where relevant, however, the Court may cite directly to the underlying document.

units, one a medical housing unit and the other a non-medical housing unit. (*Id.* at 10:2–11:5.) On one occasion while Plaintiff was living in the medical housing unit, a corrections officer named Officer Delpesce[2] allegedly "abused" Plaintiff when Plaintiff told the nurse that he did not want to take the medication she had given him. According to Plaintiff, "the nurse called the officer and tell the officer that I don't want to cooperate with them. So I tell the officer, That's my right. I don't wanna take . . . the pills because when I take the pills I don't feel good, so he push me with his hand open in my stomach [or "heart area"] three times." (*Id.* at 12:9–13:25; *see also id.* at 46:3–47:4.) At the time of this incident, Plaintiff had just returned from the hospital after being treated for a heart condition, although Officer Delpesce was not aware of that fact. (*Id.* at 29:13–25.) Plaintiff then asked to see the doctor but, instead, the officer sent Plaintiff, without clothes, to a "cold room" that is used for suicidal inmates. (*Id.* at 19:13–16; *see also id.* at 20–21, 24.) When a sergeant inquired as to what had occurred, the officer "lied to the sergeant" and said that Plaintiff had threatened self-harm. (*Id.* at 23:19–24:22.)

While Plaintiff was in the "cold room," he asked to see a doctor "to check on [his] stomach . . . [and] chest," but was instead given a "psych doctor," who could not perform a physical examination. (*Id.* at 28:13–22.)[3] Plaintiff disclosed the pushing incident to the doctor and showed the doctor where on his body the corrections officer had pushed him. (*Id.* at 27:10–29:12.) Plaintiff was kept in the "cold room" through dinner and then moved back to his cellblock. (*Id.* at 25:2–24.)

The following day, Plaintiff requested a grievance form from corrections officers "at the

---

[2] The parties have not provided Officer Delpesce's first name.

[3] However, Plaintiff also testified at his deposition that he did eventually receive medical care for the pushing incident and the clinic prescribed him "medication." (Joseph Dep., Dkt. 105-4, at 30:2–9.)

booth" in his cellblock to complain about Officer Delpesce's conduct. (*Id.* at 22:12–23:12.) According to Plaintiff, they "refused [him]" and "didn't give [him] the paper to fill for a grieving." (*Id.* at 22:16–18.) Since he was denied a grievance form, he used the sick call form to document his complaint. (*Id.* at 31:17–32:16 ("They refused me, but I find way to put it in the sick call because the sick call they give you a paper you can say exactly what happened, and then that's when I put exactly what happened.").) According to Plaintiff, he also called social services, and "they told [Plaintiff] . . . they work separate with the jail, so whatever happen in jail is jail, so they cannot help [him]." (*Id.* at 32:17–33:3.) Plaintiff also "sent a letter to [New York State's] Mental Health Department for abusing inmates," but never received a response. (*Id.* at 33:3–10.)

### B. Plaintiff's First Amendment Allegations

Plaintiff also alleges that he was denied access to "Muslim services" and "Muslim housing." (*Id.* at 60:16–66:15.) Specifically, the officers "didn't even let [Plaintiff] sign for Muslim services" and told Plaintiff the jail "didn't have Muslim services." (*Id.* at 61:21–23.) Plaintiff also alleges that there was "a special house for Muslim" at the NCCC that they would not transfer him to, but he also states that he "[did]n't know if they have a Muslim house or not." (*Id.* at 61:20–63:19.)

According to Plaintiff, the procedure to request to go to services each week was as follows, "I think . . . they come in the lobby, . . . they have the paper in their hand, one of the officer, and then they go to each cell and then they ask who want to go to Muslim services, Catholic services, . . . and then they come and sign your name, and then when the day arrive and then they just come and pick you up and then go." (*Id.* at 61:8–16.) However, according to the NCCC's Inmate Handbook, "[u]pon admission to the facility, an inmate's choice of religion will be recorded, and the inmate will only be allowed to attend that service. If an inmate wishes to change their

3

religion[,] they must contact a Chaplain and complete a change of religion form. Forms are available and can be obtained by request from Correction Officers assigned in your housing area." (Dkt. 102-9, at 9.) Plaintiff alleges that he was not asked about his religious affiliation during intake, but that he was permitted to attend Catholic services. (Joseph Dep., Dkt. 105-4, at 65:9–20.) Plaintiff did not file a change of religion form or file a grievance in connection with these allegations. (*Id.* at 64:18–12.)[4]

### C. Plaintiff's Deliberate Indifference to Medical Care Allegations

With respect to his deliberate indifference to medical care claim, it appears that Plaintiff is alleging that he was given the wrong psychiatric medication or, alternatively, that he was given a vaccine by a non-party hospital that "messed up [his] whole system." (*Id.* at 51:9–52:8, 71:22–72:5, 75:16–21, 94:3–20; *see also id.* at 88:17–18 ("After they gave me medication, that's when I seen mental health, and that's a no-no."); Dkt. 1, at ECF 4 ("[T]he medical staff gave me wrong medication.").) At some point, Plaintiff stopped taking the medications given to him at the NCCC because they made him "feel weak" and he could only run "for two or five minutes." (Joseph Dep., Dkt. 105-4, at 74:16–75:21, 94:18–95:9.) However, at his deposition, Plaintiff testified that, after he got out of prison, his primary care physician told him that he is anemic and that is "the reason that I feel very weak, I can't run no more . . . because of the weakness." (*Id.* at 79:15–80:17.)

---

[4] In Plaintiff's opposition to Defendants' summary judgment motions, he states that his "complaint about Muslim services . . . was denied." (Dkt. 103, at ECF 6 (page numbers refer to the pagination generated by the court's CM/ECF docketing system, and not the document's internal pagination).) Given Plaintiff's deposition testimony that he never filed a grievance about being denied access to Muslim services (Joseph Dep., Dkt. 105-4, at 64:18–12), the Court will not consider this allegation. *See In re Fosamax Prods. Liab. Litig.*, 707 F.3d 189, 193 (2d Cir. 2013) (holding "the sham issue of fact doctrine, which prohibits a party from defeating summary judgment simply by submitting an affidavit that contradicts the party's previous sworn testimony" (internal quotation marks omitted)).

4

Plaintiff did not file a grievance relating to his medical care because the doctor and two nurses told him, "Hey, you already in clinical so you can tell us what happened. And then I tell them exactly what happened." (*Id.* at 90:8–12.) The doctor and nurses then began to "come every morning" to check on him. (*Id.* at 90:23–91:7.) It is unclear from the record whether they continued to offer him the purportedly wrong psychiatric medication or not.

## II.     Procedural History

Plaintiff filed his original complaint in this action on April 17, 2018. (Dkt. 1.) In June 2019, he amended his complaint to add a First Amendment claim relating to the "Muslim services." (Dkt. 46.)

On June 10, 2021, the Court held a conference with the parties where "[t]he Court confirmed, and the [p]arties agreed, that Plaintiff's Amended Complaint consists of the following claims under 28 U.S.C. Section 1983: (1) an excessive force claim against Correctional Officer Delpesce; (2) a deliberate indifference claim based on the alleged inadequacy of medical care against Defendant Nassau County and Defendant [NHCC]; (3) a First Amendment claim based on the alleged denial of access to 'Muslim services' or Muslim housing against Defendant Nassau County." (06/10/2021 Minute Entry.) Defendants' motions for summary judgment were fully briefed on December 1, 2021. (Dkts. 102, 105.)

## LEGAL STANDARD

Summary judgment is appropriate where the submissions of the parties, taken together, "show[] that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251–52 (1986) (The summary judgment inquiry is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must

5

prevail as a matter of law."). "A fact is material if it 'might affect the outcome of the suit under the governing law.'" *Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC*, 13 F.4th 247, 259 (2d Cir. 2021) (quoting *Anderson*, 477 U.S. at 248). "To present a 'genuine' issue of material fact sufficient to defeat a motion for summary judgment, the record must contain contradictory evidence 'such that a reasonable jury could return a verdict for the nonmoving party.'" *Horror Inc. v. Miller*, 15 F.4th 232, 241 (2d Cir. 2021) (quoting *Anderson*, 477 U.S. at 248).

"The moving party bears the burden to demonstrate the absence of any genuine issues of material fact . . . ." *New York v. Mountain Tobacco Co.*, 942 F.3d 536, 541 (2d Cir. 2019). Once this burden is met, the burden shifts to the nonmoving party to proffer some evidence establishing the existence of a question of material fact that must be resolved at trial. *See Spinelli v. City of New York*, 579 F.3d 160, 166–67 (2d Cir. 2009); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986). A mere "scintilla of evidence" in support of the nonmoving party is insufficient; "there must be evidence on which the jury could reasonably find for the [non-movant]." *Anderson*, 477 U.S. at 252; *Marvel Characters, Inc. v. Kirby*, 726 F.3d 119, 143 (2d Cir. 2013). That is, "the nonmoving party must come forward with specific facts showing that there is a *genuine issue for trial*." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (internal quotation marks omitted); *Higazy v. Templeton*, 505 F.3d 161, 169 (2d Cir. 2007).

"[A]t the summary judgment stage, the district court is not permitted to make credibility determinations or weigh the evidence . . . ." *Kee v. City of New York*, 12 F.4th 150, 166 (2d Cir. 2021). It must "consider the record in the light most favorable to the non-movant" and "resolve all ambiguities and draw all factual inferences in favor of the non-movant 'if there is a "genuine" dispute as to those facts.'" *Loreley*, 13 F.4th at 259 (quoting *Scott v. Harris*, 550 U.S. 372, 380 (2007)). "[T]he district court may not properly consider the record in piecemeal fashion; rather, it

6

must 'review all of the evidence in the record.'" *S. Katzman Produce Inc. v. Yadid*, 999 F.3d 867, 877 (2d Cir. 2021) (quoting *Reeves v. Sanderson Plumbing Prod., Inc.*, 530 U.S. 133, 150 (2000)).

When a *pro se* litigant is involved, "the same standards for summary judgment apply, but the pro se litigant should be given special latitude in responding to a summary judgment motion." *Williams v. Savory*, 87 F. Supp. 3d 437, 451 (S.D.N.Y. 2015) (citation and internal quotation marks omitted).

## DISCUSSION

**I.  Defendant Nassau County's Motion for Summary Judgment is Granted as to Plaintiff's Excessive Force Claim.**

The Eighth Amendment prohibits the infliction of "cruel and unusual punishments." U.S. Const. amend. VIII.  Courts have construed the Eighth Amendment "to protect prison inmates' right to be free from the use of excessive physical force by prison officials." *Jones v. Falco*, No. 20-CV-348, 2022 WL 3668358 (VB), at *5 (S.D.N.Y. Aug. 25, 2022).  To state a *prima facie* excessive force claim, a plaintiff must establish "an objective component and a subjective component." *Id.*

> To establish the objective component, a plaintiff must show the alleged wrongdoing was objectively harmful enough to establish a constitutional violation. In determining whether conduct was objectively harmful enough, courts must consider the harm done in light of contemporary standards of decency. . . . To establish the subjective component of an excessive-force claim, a plaintiff must show the defendant had the necessary level of culpability, shown by actions characterized by wantonness in light of the particular circumstances surrounding the challenged conduct.

*Id.* at 5–6  (internal citations and quotation marks omitted).  However, "not every malevolent touch by a prison guard gives rise to a federal cause of action." *Wilkins v. Gaddy*, 559 U.S. 34, 37–38 (2010) (internal quotation marks omitted); *id.* at 38 ("An inmate who complains of a push or shove that causes no discernible injury almost certainly fails to state a valid excessive force claim." (internal quotation marks omitted)).

7

Here, Plaintiff's sole allegation of excessive force—that he was pushed by Officer Delpesce— "do[es] not approach an Eighth Amendment claim," particularly where Plaintiff suffered no discernable injury and "[t]he force [he] describes is not sufficiently serious or harmful to reach constitutional dimensions." *Boddie v. Schnieder*, 105 F.3d 857, 862 (2d Cir. 1997) ("[Plaintiff's] allegations of excessive force—that he was bumped, grabbed, elbowed, and pushed . . . do not approach an Eighth Amendment claim."); *see also Abreu v. Nicholls*, 368 F. App'x 191, 194 (2d Cir. 2010) (summary order) ("[I]t is well accepted that a mere push or shove is not actionable under the Eighth Amendment."); *Rivera v. Connolly*, No. 18-CV-03958 (PMH), 2022 WL 1785313, at *5 (S.D.N.Y. June 1, 2022) ("According to Plaintiff, Defendant shoved Plaintiff twice. As an introductory point, years of precedent counsel that such conduct does not satisfy the objective prong of an Eighth Amendment claim.") (collecting cases). Shoves are "by their very nature *de minimis* and therefore not cognizable under the Eighth Amendment." *Rivera*, 2022 WL 1785313, at *5.

Therefore, Defendant Nassau County's motion for summary judgment as to Plaintiff's excessive force claim is granted.

## II. Defendant Nassau County's Motion for Summary Judgment is Granted as to Plaintiff's First Amendment Claim.

Plaintiff next alleges that he was prevented from attending "Muslim services" and living in "Muslim housing," thereby violating his free exercise rights under the First Amendment. Defendant Nassau County's motion for summary judgment is granted as to this claim.

Under the Prison Litigation Reform Act ("PLRA"), "a prisoner confined in any jail, prison, or other correctional facility" may not bring an action "with respect to prison conditions . . . until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a). As Plaintiff was a "prisoner confined in any . . . correctional facility" at the time of the events in question, his

First Amendment claim is subject to the exhaustion requirements of the PLRA. *See Green Haven Prison Preparative Meeting of Religious Soc'y of Friends v. New York State Dep't of Corr. & Cmty. Supervision*, 16 F.4th 67, 81 (2d Cir. 2021). The PLRA requires "proper exhaustion" of administrative remedies, meaning exhaustion in "compliance with an agency's deadlines and other critical procedural rules," *Woodford v. Ngo*, 548 U.S. 81, 90 (2006), "using all steps that the agency holds out, and doing so properly," *Amador v. Andrews*, 655 F.3d 89, 96 (2d Cir. 2011). As the Second Circuit has explained, "prisoners must complete the administrative review process in accordance with the applicable procedural rules—rules that are defined not by the PLRA, but by the prison grievance process itself," *Johnson v. Killian*, 680 F.3d 234, 238 (2d Cir. 2012) (citation omitted), including as set forth in an inmate handbook, *Ruggiero v. Cnty. of Orange*, 467 F.3d 170, 178 (2d Cir. 2006).

According to the NCCC's Inmate Handbook, "[u]pon admission to the facility, an inmate's choice of religion will be recorded, and the inmate will only be allowed to attend that service. If an inmate wishes to change their religion[,] they must contact a Chaplain and complete a change of religion form." (Dkt. 102-9, at ECF 9.) Here, Plaintiff's religion "upon admission" was not Muslim and he did not complete a change of religion form. (Joseph Dep., Dkt. 105-4, at 64-65.) Additionally, Plaintiff admits that he did not file a grievance "within five (5) days of the date of the act or occurrence leading to the grievance," *i.e.* the denial of his request to attend "Muslim services" or be in "Muslim housing," as required by the Inmate Handbook. (Dkt. 102-9, at ECF 4; *see also* Joseph Dep., Dkt. 105-4, at 64:8–12.) As Plaintiff concedes that he did not comply with the NCCC's procedural rules, his First Amendment claim fails for failure to exhaust his administrative remedies.

Even considering Plaintiff's claim on the merits, the outcome is the same. The Second Circuit has "long held that prisoners should be afforded every reasonable opportunity to attend religious services, whenever possible" and, therefore, "[a] prisoner's first amendment right to the free exercise of his religious beliefs may only be infringed to the extent that such infringement is reasonably related to legitimate penological interests." *Young v. Coughlin*, 866 F.2d 567, 570 (2d Cir. 1989). To prevail on a First Amendment claim under § 1983, "[t]he prisoner must show at the threshold that the disputed conduct substantially burdens his sincerely held religious beliefs. The defendants then bear the relatively limited burden of identifying the legitimate penological interests that justify the impinging conduct; the burden remains with the prisoner to show that these articulated concerns were irrational." *Green Haven Prison Preparative Meeting of Religious Soc'y of Friends*, 16 F.4th at 84 (internal citations omitted). As the Second Circuit has explained, "the relevant question in determining whether [a plaintiff's] religious beliefs were substantially burdened is whether participation in [the activity] . . . is considered central or important to [the plaintiff's] practice of Islam." *Ford v. McGinnis*, 352 F.3d 582, 593–94 (2d Cir. 2003).

Here, Plaintiff has failed to meet his burden of demonstrating that (i) he has a religious belief and (ii) that it is sincerely held. *See Arrotta v. Ulster Cty. Sheriff's Dept.*, No. 22-CV-0638, 2022 WL 4235463 (GLS/TWD), at *4 (N.D.N.Y. Sept. 14, 2022) ("A religious belief is sincerely held when the plaintiff subjectively, sincerely holds a particular belief that is religious in nature."). While Plaintiff alleges that he wanted to attend "Muslim services" and live in "Muslim housing," he does not actually articulate what his religious beliefs are, whether he is Muslim, or whether the housing and religious services "were central or important to [his] faith." *Lopez v. Cipolini*, 136 F. Supp. 3d 570, 588 (S.D.N.Y. 2015) (internal quotation marks omitted). This constitutes an independent ground on which to dismiss Plaintiff's free-exercise-of-religion claim.

### III. Defendants' Motion for Summary Judgment are Granted as to Plaintiff's Deliberate Indifference to Medical Care Claim.

Plaintiff's final claim is one for deliberate indifference to his medical needs because the medical staff "gave [him the] wrong medication." (Dkt. 1, at ECF 4.) Defendants Nassau County and NHCC's motions for summary judgment are granted as to this claim.

The Supreme Court has held that deliberate indifference by prison officials to a prisoner's serious medical need constitutes cruel and unusual punishment in violation of the Eighth Amendment. *See Estelle v. Gamble*, 429 U.S. 97, 104 (1976). To succeed on an Eighth Amendment deliberate indifference claim, a plaintiff must satisfy two requirements: "he must show both that the danger posed by the indifference he alleges is sufficiently serious and that the defendant has acted with deliberate indifference to inmate health or safety in failing to address this danger." *Smith v. Fischer,* 500 F. App'x 59, 61 (2d Cir. 2012) (summary order) (internal quotation marks omitted).

Even assuming *arguendo* that employees of Defendant NHCC administered the wrong medication to plaintiff, there is no evidence in the record to "conclude that NHCC acted with deliberate indifference to plaintiff's medical needs, that is, there is no evidence that NHCC employees acted 'while actually aware of a substantial risk that serious inmate harm [would] result.'" *Miller v. Nassau Health Care Corp.*, No. 09-CV-5128, 2012 WL 2847565 (JFB) (AKT), at *1 (E.D.N.Y. July 11, 2012) (quoting *Salahuddin v. Goord,* 467 F.3d 263, 280 (2d Cir. 2006)); *see also Revels v. Corr. Med. Care, Inc.*, No. 17-CV-88 (MAD/TWD), 2022 WL 1224407, at *9 (N.D.N.Y. Apr. 26, 2022) ("Cases have consistently held that the mistaken/negligent administration of incorrect medication is insufficient to support a claim of deliberate indifference under the Eighth Amendment.") (collecting cases); *Vail v. City of New York*, 68 F. Supp. 3d 412, 425 (S.D.N.Y. 2014) (dismissing deliberate indifference claim based on a medication error where

11

defendants "both thought that [the jail's nurse] had given Plaintiff the correct medication") (collecting cases); *Long v. Lafko*, 254 F. Supp. 2d 444, 447 (S.D.N.Y. 2003) (dismissing deliberate indifference claim based on medication error where defendant's conduct was "merely negligent or unprofessional in failing to check the medication before administering it"). In fact, it appears that once Plaintiff relayed his concerns about the side effects of the medication to the NHCC doctor and nurses, they began checking on him every morning to see how he was doing. (*See* Joseph Dep., Dkt. 105-4, at 90:23–91:7.) Therefore, even drawing all reasonable inferences in Plaintiff's favor, no rational jury could conclude that Defendants acted with deliberate indifference to Plaintiff's medical needs. Defendants' motions for summary judgment are granted as to this claim.

## CONCLUSION

For the reasons explained above, Defendants' motion for summary judgment is granted in full and this case is dismissed. The Clerk of Court is respectfully directed to enter judgment accordingly.

SO ORDERED.

*/s/ Pamela K. Chen*
Pamela K. Chen
United States District Judge

Dated: September 30, 2022
       Brooklyn, New York